[Cite as *Definitive Solutions Co., Inc. v. Sliper*, 2016-Ohio-533.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


DEFINITIVE SOLUTIONS COMPANY, INC.,

      Plaintiff-Appellant,

  vs.

MICHAEL SLIPER,

CREATIVE ELEMENTS GROUP, LLC,

SEAN HUNTER,

ROBERT A. FELTNER,

    and

MELISSA R. MCCLANAHAN,

      Defendants,

    and

THE PROCTOR & GAMBLE COMPANY,

      Defendant-Appellee.

APPEAL NO. C-150281
TRIAL NO. A-1110530


*O P I N I O N.*

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  February 17, 2016

*Santen & Hughes*, *J. Robert Linneman* and *Brian P. O'Connor*, for Plaintiff-Appellant,

*Dinsmore and Shohl LLP, Mark A. Vanderlaan* and *Mark G. Arnzen, Jr.*, for Defendant-Appellee.

**Please note:  this case has been removed from the accelerated calendar.**

**DEWINE, Judge.**

{¶1}   This appeal involves four employees of a software- and digital-design firm that was doing work for the Procter & Gamble Company ("P&G").   The employees left their jobs, formed their own company, and took P&G's business with them.   Their old boss sued P&G, saying that P&G had breached an agreement that it not "directly solicit for employment" employees who had worked on its account, and also that P&G had tortiously interfered with its relationship with the employees.   The trial court granted summary judgment for P&G, and the design firm appeals.   We affirm the trial court.   We think the agreement means exactly what it says:   it prohibits solicitation for employment, not solicitation of another company to perform work.   And we find nothing in P&G's conduct that rises to the level of tortious interference.

## I. Employees Form a New Business and Steal Their Old Firm's Client

{¶2}   Definitive Solutions Company, Inc., ("DSC") provided various design and technology services to P&G on a contract basis.   Michael Sliper, Sean Hunter, Robert Feltner and Melissa McClanahan ("Employee Defendants") were DSC employees who were assigned to the P&G account.   They worked closely with P&G employees, were often contacted directly by P&G for work on projects, and sometimes worked on-site at P&G.

{¶3}   In 2011, the Employee Defendants—one by one—left DSC.   They joined a new company, Creative Elements Group, LLC, ("CEG") that had been formed by Sliper.   As they were leaving, they schemed to make sure that the P&G work followed them to the new company. They told their P&G contacts that DSC was in a financial

crisis, and that they were forming their own business so that P&G could be assured that the same people who had been working on its projects would continue to do so. Some of the Employee Defendants even made proposals to P&G on behalf of their new employer while still employed at DSC. The scheme worked. P&G sent its work to CEG.

{¶4} In December 2011, DSC figured out what was going on. It fired Sliper, the only one of the Employee Defendants still at DSC. And it instituted a lawsuit against CEG, the Employee Defendants and P&G.

{¶5} The trial court granted summary judgment in favor of P&G. It rejected DSC's claim that P&G's actions were in violation of its agreement not to "directly solicit for employment a current or former [DSC] employee." And it concluded that P&G's actions did not constitute tortious interference with DSC's employment relationships.

{¶6} Claims against the other defendants proceeded to trial. Following a bench trial, the court found Employee Defendants and CEG liable to DSC, and entered judgment accordingly.

{¶7} DSC now appeals from the trial court's grant of summary judgment in favor of P&G.

## II. P&G Did Not Violate the Services Agreement

{¶8} In its first assignment of error, DSC argues that the trial court erred in granting summary judgment to P&G on DSC's breach-of-contract claim. Specifically, DSC contends that P&G breached provisions of a "Services Agreement" between the parties that precluded one party from soliciting for employment an employee of the

other party. According to DSC, the most "glaring" example of solicitation for employment occurred when P&G emailed Sliper at his CEG email address, while he was still employed with DSC, requesting that CEG furnish a proposal for a project that DSC had been working on.

{¶9} We turn first to the applicable provision of the Services Agreement:

10.4 **Neither PARTY will directly solicit for employment a current or former employee of the other PARTY** who has performed any work in connection with this AGREEMENT. This provision will remain in effect during the term of the SERVICES and for one (1) year from the date of said former employee's separation of employment from P&G or CONTRACTOR. Any exceptions to this provision will be in writing and signed by the authorized representatives of each PARTY. For the purposes of this AGREEMENT, advertisements, use of search firms, and other conventional means of obtaining employees will not be construed as direct solicitation unless the PARTY utilizing such conventional means specifically directs the efforts of the employee(s) of the other PARTY. Further it is acknowledged that simply hiring an employee of the other PARTY is not a restricted activity in the absence of an improper solicitation as described above.

(Emphasis added.)

{¶10} What we have before us is a fairly straightforward matter of contract interpretation. The question is whether alleged communications by P&G to the

5

Employee Defendants requesting a proposal from CEG constitute a solicitation for employment of the Employee Defendants.

{¶11} It is undisputed that P&G never tried to directly hire any of the Employee Defendants. Rather, under DSC's construction, P&G solicited the Employee Defendants "for employment" when it solicited a proposal from the new company that they had formed. Under its reading, employment includes any work performed, whether an individual is on P&G's payroll or the payroll of another company that contracts with P&G. P&G says no: "solicit for employment" means solicit for employment as a direct employee of P&G, and the solicitation of a different company to do work doesn't constitute the solicitation of an employee for employment.

{¶12} We think P&G has the better of the argument. In our view, an ordinary reader of the English language would hardly think that recruiting a different company to perform work under a contract constitutes the "direct[] solicit[ation] for employment" of an "employee or former employee."

{¶13} To succeed in its argument, DSC has to show that "employment," as the term is used in the agreement, has a broad meaning that includes contract work performed as an employee of another company. But where an individual works for a company that is hired by a third party to provide services, we don't commonly think of the individual as in the employment of the third party. Suppose a homeowner has a clogged sink and calls Acme Plumbing for help. We all understand that the plumber who shows up to snake the drain is in the employment of Acme, not the homeowner. The same goes for the Employee Defendants in this case. This common understanding is demonstrated by the definition of an employee in the

6

community created and edited "encyclopedia" Wikipedia, which provides that an employee is "a person who is hired to provide services to a company on a regular basis in exchange for compensation *and who does not provide these services as part of an independent business.*" (Emphasis added.) Wikipedia, *Employee*, https://en.wikipedia.org/wiki/Employment#Employee_or_employers (accessed February 1, 2016).

{¶14} DSC suggests that simply asking the Employee Defendants to perform work for P&G constitutes a solicitation for employment. But that can't be right. If that were the case, P&G violated the Services Agreement every time it asked one of the Employee Defendants to work on a project, even when DSC still employed the Employee Defendants, and while P&G paid DSC for the Employee Defendants' work. We will not interpret a contractual provision to reach an absurd result. *See Kahler v. Cincinnati Inc.*, 1st Dist. Hamilton No. C-140407, 2015-Ohio-979, ¶ 16, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus.

{¶15} Thus far, we have focused our interpretation on the first sentence of section 10.4—the restriction on "directly solicit[ing] for employment." And while this is certainly the most important part of the provision, the remainder supports our interpretation as well. When read as a whole, it is clear that the motivating concern behind the prohibition is with the direct employment of an individual. The provision makes specific exception for the use of search firms, advertisements and "other conventional means of hiring employees." And it makes clear that the "hiring" of an "employee" without an improper solicitation is not a violation of the agreement.

7

Nothing in the provision indicates that it was intended to have any applicability to contractual relationships beyond the direct employer-employee relationship.

{¶16} DSC also cites cases in which a person in an independent-contractor relationship with a business has been found to be in an employment relationship for purposes of a noncompete provision. *See, e.g.*, *Am. Healthcare Servs., Inc. v. Akabuaka*, 1oth Dist. Franklin No. 10AP-777, 2010-Ohio-5631. And it is true that a noncompete provision may extend beyond individuals who perform work as direct employees to also include persons who do work as independent contractors. *Id.* at ¶ 20-21. Thus, a hairdresser who signs a noncompete is bound by it even though she is not an "employee" of the salon for IRS purposes, but rather an independent contractor. *See, e.g.*, *Albert v. Shiells*, 10th Dist. Franklin No. 02AP-354, 2002-Ohio-7021. But here, P&G never solicited any of the individual Employee Defendants to work as independent contractors for P&G, it solicited—and contracted with—CEG. Because it did not try to hire any of the individual Employee Defendants as P&G employees, it did not violate the agreement.

{¶17} DSC additionally argues that P&G violated the Services Agreement by failing to act in good faith towards DSC. Almost every contract contains an implied duty of good faith and fair dealing. *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49, ¶ 21 (1st Dist.). DSC contends that P&G violated this implied duty by allowing CEG to undercut DSC prices. But we find nothing in the record that suggests a lack of good faith on the part of P&G. As the trial court determined, P&G and the Employee Defendants had a good working relationship. After Sliper convinced P&G that DSC was suffering financially, P&G simply made a

8

business decision to retain CEG so that it could continue to receive the services it needed.

{¶18} Thus, the trial court properly granted summary judgment in favor of P&G on DSC's breach-of-contract claim. We overrule DSC's first assignment of error.

### III. P&G did not Tortiously Interfere with DSC's Employment Relationship with its Employees

{¶19} DSC's second assignment of error challenges the trial court's grant of summary judgment on its claim for tortious interference with an employment or business relationship. In its complaint, DSC alleges that P&G, as an "outsider" to the employment relationship, tortiously interfered with DSC's relationship with the Employee Defendants by intentionally soliciting the Employee Defendants and by inducing them to leave DSC.

{¶20} As this court has recognized, "the right to non-interference in an employment relationship is limited." *Wilson v. Proctor & Gamble*, 1st Dist. Hamilton No. C-970778, 1998 Ohio App. LEXIS 5290, *14 (Nov. 6, 1998). Businesses frequently recruit at-will employees from other businesses and absent some form of improper conduct, the law offers little protection. The law does allow a claim for interference with an employment relationship to be brought against an "outsider" to the relationship. Such an action, however, requires a showing of malicious conduct on the part of the outsider. *Id.* at *14-15, citing *Anderson v. Minter*, 32 Ohio St.2d 207, 214, 291 N.E.2d 457 (1972).

{¶21} DSC argues that the trial court applied the wrong standard when it granted summary judgment. It says the trial court required evidence of intimidation or coercion in soliciting the employees, when all that was required under Ohio law

9

was evidence of malicious conduct or improper interference by P&G. *Compare Kenker Box Co. v. Riemeier Lumber Co.*, 1st Dist. Hamilton Nos. C-990803 and C-990824, 2000 Ohio App. LEXIS 6198 (Dec. 29, 2000) *with Wilson* and *Anderson.*

{¶22} But even if we apply the malicious-conduct or improper-interference standard, DSC still cannot succeed. The record shows that P&G had virtually no contact with DSC ownership, and that P&G had a good working relationship with the Employee Defendants. Once P&G was convinced that DSC was struggling financially, it simply sought to protect its interests by contracting with a company (CEG) that it believed would fulfill its needs. Because there is no evidence in the record that P&G maliciously or improperly interfered with DSC's relationship with the Employee Defendants, DSC cannot succeed on its tortious-interference claim. We overrule DSC's second assignment of error.

## IV. Conclusion

{¶23} The trial court properly granted summary judgment in favor of P&G on DSC's claims for breach of contract and tortious interference with an employment or business relationship. We affirm the judgment of the trial court.

Judgment affirmed.

**HENDON, P.J.,** and **CUNNINGHAM, J.,** concur.

Please note:
    The court has recorded its own entry on the date of the release of this opinion.

10